**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RICHARD CARTER, Individually and on Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) | Case No. 1:20-cv-03865 |
| v. ) | |
| WILLIS TOWERS WATSON PUBLIC LIMITED COMPANY, VICTOR F. GANZI, JOHN J. HALEY, ANNA C. CATALANO, WENDY E. LANE, BRENDAN R. O'NEILL, JAYMIN B. PATEL, LINDA D. RABBITT, PAUL THOMAS and WILHELM ZELLER, ) ) ) ) ) ) ) ) | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** **JURY TRIAL DEMANDED** |
| Defendants. ) | |

Plaintiff Richard Carter ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

<u>**NATURE OF THE ACTION**</u>

1. This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Willis Towers Watson Public Limited Company ("Willis Towers" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants" and, together with Willis Towers, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Transaction") between Willis Towers and Aon plc ("Aon").

2. On March 9, 2020, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which the Company's shareholders stand to

receive 1.08 Class A ordinary shares of Aon for each share of Willis Towers stock they own (the "Merger Consideration"). Upon completion of the merger, Willis Towers shareholders will own approximately 37% and Aon shareholders will own approximately 63% of the combined company.

3.     On May 11, 2020, in order to convince Willis Towers shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Form PREM14A Preliminary Proxy Statement (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act. The materially incomplete and misleading preliminary proxy violates both Regulation G (17 C.F.R. § 244.100) and SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), each of which constitutes a violation of Sections 14(a) and 20(a) of the Exchange Act.

4.     While touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, Defendants have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Transaction, thereby violating SEC rules and regulations and rendering certain statements in the Proxy materially incomplete and misleading.

5.     In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that Willis Towers shareholders vote in favor of the Proposed Transaction; and (ii) the summary of certain valuation analyses conducted by Willis Towers' financial advisor, Goldman Sachs & Co. LLC ("Goldman Sachs") in support of its opinion that the Merger Consideration is fair to shareholders, on which the Board relied.

6.      It is imperative that the material information that has been omitted from the Proxy is disclosed prior to the forthcoming vote to allow the Company's shareholders to make an informed decision regarding the Proposed Transaction.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of: (i) Regulation G (17 C.F.R. § 244.100); and (ii) Rule 14a-9 (17 C.F.R. § 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to Willis Towers shareholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.      Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because a substantial portion of the alleged wrongs took

place in this District and the Company's common stock trades on the NASDAQ Composite, which is headquartered in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, a holder of Willis Towers common stock.

12.     Defendant Willis Towers is incorporated in Ireland and maintains its principal executive offices at 51 Lime Street, London, EC3M 7DQ, England. The Company's common stock trades on the NASDAQ under the ticker symbol "WLTW."

13.     Individual Defendant Victor F. Ganzi is Willis Towers' Chairman and has been a director of Willis Towers at all relevant times.

14.     Individual Defendant John J. Haley is Willis Towers' Chief Executive Officer and has been a director of Willis Towers at all relevant times.

15.     Individual Defendant Anna C. Catalano has been a director of Willis Towers at all relevant times.

16.     Individual Defendant Wendy E. Lane has been a director of Willis Towers at all relevant times.

17.     Individual Defendant Brendan R. O'Neill has been a director of Willis Towers at all relevant times.

18.     Individual Defendant Jaymin B. Patel has been a director of Willis Towers at all relevant times.

19.     Individual Defendant Linda D. Rabbitt has been a director of Willis Towers at all relevant times.

20.    Individual Defendant Paul Thomas has been a director of Willis Towers at all relevant times.

21.    Individual Defendant Wilhelm Zeller has been a director of Willis Towers at all relevant times.

22.    The Individual Defendants referred to in paragraphs 13-21 are collectively referred to herein as the "Individual Defendants" and/or the "Board."

## CLASS ACTION ALLEGATIONS

23.    Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Willis Towers (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

24.    This action is properly maintainable as a class action because:

a.    The Class is so numerous that joinder of all members is impracticable.  As of May 5, 2020, there were approximately 129,000,000 shares of Willis Towers common stock outstanding, held by hundreds of individuals and entities scattered throughout the country.  The actual number of public shareholders of Willis Towers will be ascertained through discovery;

b.    There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)    whether Defendants disclosed material information that includes non-GAAP financial measures without providing a reconciliation of the same non-GAAP financial measures to their most directly

comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

ii)     whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the Proxy in violation of Section 14(a) of the Exchange Act;

iii)    whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv)     whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading Proxy.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.     A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**I.     The Proposed Transaction**

25.     Willis Towers is a global advisory, broking and solutions company that serves clients in more than 140 countries. The Company designs and delivers solutions that manage risk, optimize benefits, cultivate talent and expand the power of capital to protect and strengthen institutions and individuals.

26.     On March 9, 2020, Willis Towers and Aon issued a joint press release announcing the Proposed Transaction, which states in pertinent part:

LONDON, March 9, 2020 /PRNewswire/ -- Aon plc (NYSE:AON) and Willis Towers Watson (NASDAQ: WLTW) today announced a definitive agreement to combine in an all-stock transaction with an implied combined equity value of approximately $80 billion.

"The combination of Willis Towers Watson and Aon is a natural next step in our journey to better serve our clients in the areas of people, risk and capital," said Willis Towers Watson CEO John Haley. "This transaction accelerates that journey by providing our combined teams the opportunity to drive innovation more quickly and deliver more value."

"This combination will create a more innovative platform capable of delivering better outcomes for all stakeholders, including clients, colleagues, partners and investors," said Aon CEO Greg Case. "Our world-class expertise across risk, retirement and health will accelerate the creation of new solutions that more efficiently match capital with unmet client needs in high-growth areas like cyber, delegated investments, intellectual property, climate risk and health solutions."

**Strategic Rationale**

- **Combines two highly complementary businesses into a technology-enabled global platform that is more relevant and responsive to client needs.** The transaction unites firms that share a belief in the power of data-driven insights to create new sources of client value.

- 7 -

- **Provides opportunity to expand and further accelerate execution against the existing Aon United and Willis Towers Watson growth strategies.** The new firm will have an established focus on client value and its combined management teams have considerable experience with the integration of large, complex transactions. The teams have a shared appreciation for the importance of colleague development, the effectiveness of a one-firm growth strategy and the value of its application to the combined enterprise.

- **Expected to drive year one earnings accretion to Aon adjusted EPS[2] with free cash flow accretion[1] of more than 10% after full realization of $800 million of expected pre-tax synergies.[3]** The transaction is expected to generate more than $10 billion in shareholder value creation from the capitalized value of expected pre-tax synergies, based on the blended 2020 price to earnings ratio of Willis Towers Watson and Aon UK on 6 March 2020, net of $2.0 billion in expected one-time transaction, retention and integration costs.[5]

- **Ongoing commitment to long-term financial goals of mid-single digit or greater organic revenue growth and double-digit free cash flow growth.[1]** The combined platform generated significant revenue of approximately $20 billion and free cash flow of $2.4 billion in 2019. The combined firm will be well-positioned to immediately deliver mid-single digit organic revenue growth or greater and, over the long term, double-digit free cash flow growth.[1]

- **Strong balance sheet and a commitment to a disciplined capital management approach based on Return on Invested Capital (ROIC).** Strong cash flow ensures ability to invest disproportionately in highest return areas of growth and innovation for the benefit of clients. The combined firm is committed to maintaining Aon's current credit rating.

**Structure and Governance**

The combined company, to be named Aon, will be the premier, technology-enabled global professional services firm focused on the areas of risk, retirement and health.

Aon will maintain operating headquarters in London, United Kingdom. John Haley will take on the role of Executive Chairman with a focus on growth and innovation strategy. The combined firm will be led by Greg Case and Aon Chief Financial Officer Christa Davies, along with a highly experienced and proven leadership team that reflects the complementary strengths and capabilities of both organizations. The Board of Directors will comprise proportional members from Aon and Willis Towers Watson's current directors.

**Transaction Details**

Under the terms of the agreement unanimously approved by the Boards of Directors of both companies, each Willis Towers Watson shareholder will receive 1.08 Aon ordinary shares for each Willis Towers Watson ordinary share, and Aon shareholders will continue to own the same number of ordinary shares in the combined company as they do immediately prior to the closing. Upon completion of the combination, existing Aon shareholders will own approximately 63% and existing Willis Towers Watson shareholders will own approximately 37% of the combined company on a fully diluted basis.

Aon anticipates that the transaction will provide annual pre-tax synergies and other cost reductions of $800 million by the third full year of combination, thereby allowing the firm to continue significant investment in innovation and growth. Potential revenue synergies due to complementary capabilities are expected but not included in the synergy estimates. The principal sources of potential synergies and other cost reductions are as follows:

- Approximately 73% from the consolidation of business and central support functions, including leveraging the capabilities of the Aon Business Services operational platform across the combined group; and
- Approximately 27% from the consolidation of infrastructure related to technology, real estate and third-party contracts

The transaction is expected to be accretive to Aon adjusted EPS in the first full year of the combination with peak adjusted EPS accretion in the high teens[2] after full realization of $800 million of pre-tax synergies.[3] Willis Towers Watson and Aon anticipate savings of $267 million in the first full year of the combination, reaching $600 million in the second full year, with the full $800 million achieved in the third full year.[3] Free cash flow accretion is expected to breakeven in the second full year of the combination with free cash flow accretion of more than 10% after full realization of synergies.[3] The transaction is expected to generate over $10 billion of shareholder value creation from the capitalized value of the expected pre-tax synergies, based on the blended 2020 price to earnings ratio of Willis Towers Watson and Aon UK on 6 March 2020, net of $2.0 billion in one-time transaction, retention and integration costs.

The combined firm is committed to maintaining long-term financial goals of mid-single digit or greater organic revenue growth and double-digit free cash flow growth; and is expected to maintain Aon's current credit rating.

It is intended that the combination will be implemented by means of a court-sanctioned scheme of arrangement of Willis Towers Watson and Willis Towers Watson Shareholders under Chapter 1, Part 9 of the Irish Companies Act of 2014.

It is expected that the Reorganization of the Aon Group described in the

Reorganization Proxy Statement will be completed prior to the completion of the combination, such that prior to completion of the combination, Aon Ireland will be the publicly traded parent company of the Aon Group. The Reorganization remains conditional on, among other things, the sanction of the UK scheme of arrangement forming part of the Reorganization by the UK Court, as more particularly described in the Reorganization Proxy Statement. Upon completion of the Reorganization, it is expected that the Aon Ireland Directors will be the same as the current Aon UK Directors.

The transaction is subject to the approval of the shareholders of both Aon Ireland and Willis Towers Watson, as well as other customary closing conditions, including required regulatory approvals. The parties expect the transaction to close in the first half of 2021, subject to satisfaction of these conditions.

**Advisors**

Aon's financial advisor in respect of the Proposed Combination is Credit Suisse Securities (USA) LLC and its legal advisors are Latham & Watkins, LLP, Freshfields Bruckhaus Deringer LLP and Arthur Cox.

Willis Towers Watson's financial advisor in respect of the Proposed Combination is Goldman Sachs & Co. LLC and its legal advisors are Weil, Gotshal & Manges LLP, Skadden, Arps, Slate, Meagher & Flom LLP and Matheson.

**Joint Conference Call and Other Materials**

Aon and Willis Towers Watson will conduct a joint live conference call and webcast today (March 9, 2020) at 8:30 a.m. (EDT). Interested parties can listen to the conference call by dialing (800) 369-3354 (within the U.S.) or (210) 234-0114 (outside of the U.S.) using access code: Aon, or via a live audio webcast at www.aon.com and www.willistowerswatson.com

A replay of the conference call will be available for 30 days following the live conference call and can be accessed by dialing (866) 452-2113 (within the U.S.) or (203) 369-1217 (outside of the U.S.). The replay will also be available approximately two hours after the conclusion of the call on the investor relations page of each company's website, www.aon.com and www.willistowers watson.com.

**About Aon**
Aon plc (NYSE:AON) is a leading global professional services firm providing a broad range of risk, retirement and health solutions. Our 50,000 colleagues in 120 countries empower results for clients by using proprietary data and analytics to deliver insights that reduce volatility and improve performance.

**About Willis Towers Watson**

Willis Towers Watson is a leading global advisory, broking and solutions company that designs and delivers solutions that manage risk, optimize benefits, cultivate talent and expand the power of capital to protect and strengthen institutions and individuals. Willis Towers Watson has more than 45,000 employees and services clients in more than 140 countries. For more information about Willis Towers Watson, see www.willistowerswatson.com.

27.     Willis Towers is well-positioned for financial growth and the Merger Consideration fails to adequately compensate the Company's shareholders. It is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

28.     If the false and/or misleading Proxy is not remedied and the Proposed Transaction is consummated, Defendants will directly and proximately have caused damages and actual economic loss (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

## II.     The Materially Incomplete and Misleading Proxy

29.     On May 11, 2020, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Transaction.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction. Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

*The Materiality of Financial Projections*

30.     A company's financial forecasts are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transaction.  Here, the Proxy discloses that "[t]he WTW Standalone Projections were prepared for internal use and to assist WTW's financial advisor, Goldman Sachs, with its financial analyses and opinion and the WTW Board with its consideration and evaluation of the transaction. The WTW Standalone Projections were also shared with Aon." Proxy 107.

31.     When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101).  Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions.  In regard to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K.  *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

32.     Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format."  17 C.F.R. § 229.10(b).  Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items."  17 C.F.R. § 229.10(b)(2).

33.     In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

> (i) When management chooses to include its projections in a Commission filing, *the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.* In this regard investors

should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. *The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.*

(ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, *consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.* An important benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

34.     Here, Willis Towers' shareholders would clearly find complete and non-misleading financial projections material in deciding how to vote, considering that the Board specifically relied on the financial forecasts in reaching its decision to, among other things, approve the Merger Agreement and the transactions contemplated by it. Proxy 84.

35.     As discussed further below, the non-GAAP financial projections used do not provide Willis Towers' shareholders with a materially complete understanding of the assumptions and key factors considered in developing the financial projections, which assumptions, factors and other inputs the Board reviewed.

### *The Financial Projections Relied on by the Board*

36.     The Proxy discloses that "[t]he WTW Standalone Projections were prepared for internal use and to assist WTW's financial advisor, Goldman Sachs, with its financial analyses and opinion and the WTW Board with its consideration and evaluation of the transaction. The WTW Standalone Projections were also shared with Aon." *Id.* at 107.

37.     The Proxy goes on to disclose, *inter alia*, Willis Towers' forecasted values for projected non-GAAP (Generally Accepted Accounting Principles) financial metrics for 2020

through 2024 for (1) Adjusted EBITDA, (2) Adjusted Net Income, (3) Unlevered Free Cash Flow, and (4) Levered Free Cash Flow, but fails to provide (i) the line items used to calculate these non-GAAP metrics or (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures. *Id.* at 108. Additionally, the Proxy discloses that Willis Towers' management also prepared projections for Adjusted EBITDA and Unlevered Free Cash Flow of the combined company on a pro forma basis but failed to provide (i) the values of the projected financial information, (ii) the line items used to calculate these non-GAAP financial projections or (iii) a reconciliation of these non-GAAP projections to their most comparable GAAP measures. *Id.* at 108-09.

38.    The Proxy defines Adjusted EBITDA as "net income adjusted for provision for income taxes, interest expense, depreciation and amortization, restructuring costs, transaction and integration expenses, (gain)/loss on disposal of operations and non-recurring items that, in the judgement of WTW management, significantly affect the period-over-period assessment of operating results." *Id.* at 108 n.1. Nevertheless, the Proxy fails to reconcile Adjusted EBITDA to its most comparable GAAP measure or disclose the line items used to calculate Adjusted EBITDA, rendering the Proxy materially false and/or misleading. *Id.* at 108.

39.    The Proxy defines Adjusted Net Income as "net income attributable to WTW adjusted for amortization, restructuring costs, transaction and integration expenses, (gain)/loss on disposal of operations and non-recurring items that, in WTW management's judgment, significantly affect the period over-period assessment of operating results, the related tax effect of those adjustments and the tax effects of internal reorganizations." *Id.* at 108 n.3. Nevertheless, the Proxy fails to reconcile Adjusted Net Income to its most comparable GAAP measure or disclose

the line items used to calculate Adjusted Net Income, rendering the Proxy materially false and/or misleading. *Id.* at 108.

40.     The Proxy defines Unlevered Free Cash Flow as "(i) Adjusted EBITDA minus (ii) cash taxes, capital expenditures, increases in net working capital, and other non-recurring cash income/(expense)." *Id.* at 108 n.4. Nevertheless, the Proxy fails to reconcile Unlevered Free Cash Flow to its most comparable GAAP measure or disclose the line items used to calculate Unlevered Free Cash Flow, rendering the Proxy materially false and/or misleading. *Id.* at 108.

41.     The Proxy defines Levered Free Cash Flow as "(i) Unlevered Free Cash Flow minus (ii) tax-affected interest expense." *Id.* at 108 n.5. Nevertheless, the Proxy fails to reconcile Levered Free Cash Flow to its most comparable GAAP measure or disclose the line items used to calculate Levered Free Cash Flow, rendering the Proxy materially false and/or misleading. *Id.* at 108.

42.     Willis Towers management calculated the Adjusted EBITDA and Unlevered Free Cash Flow for the combined company by "adding the values of Adjusted EBITDA and Unlevered Free Cash Flow set forth in each of the Aon Standalone Projections and the WTW Standalone Projections, and adjusting such amounts for (i) the anticipated pre-tax synergies and the pre-tax cost to achieve such synergies, in each case substantially as set forth in the Combination Benefit Statement, a copy of which is attached as Annex G to this joint proxy statement, (ii) the pre-tax transaction costs and retention costs described in the Combination Benefit Statement and (iii) in the case of Unlevered Free Cash Flow, the cash tax impact on such adjustments." *Id.* at 108-09. Nevertheless, the Proxy fails to reconcile the combined company's pro forma Adjusted EBITDA and Unlevered Free Cash Flow to their most comparable GAAP measure or disclose the line items

used to calculate the combined company's pro forma Adjusted EBITDA and Unlevered Free Cash Flow, rendering the Proxy materially false and/or misleading.  *Id.*

43.     Thus, the Proxy's disclosure of these non-GAAP financial forecasts provides an incomplete and materially misleading understanding of the Company's future financial prospects and the inputs and assumptions for which those prospects are based upon.  It is clear that those inputs and assumptions were in fact forecasted and utilized in calculating the non-GAAP measures disclosed and relied on by the Board to recommend the Proposed Transaction in violation of Section 14(a) of the Exchange Act.

44.     The non-GAAP financial projections disclosed on page 108 of the Proxy violate Section 14(a) of the Exchange Act because: (i) the use of such forecasted non-GAAP financial measures alone violates SEC Regulation G as a result of Defendants' failure to reconcile those non-GAAP measures to their closest GAAP equivalent or otherwise disclose the specific financial assumptions and inputs used to calculate the non-GAAP measures; and (ii) they violate SEC Regulation 14a-9 because they are materially misleading as without any correlation with their GAAP equivalent financial metrics, shareholders are unable to discern the veracity of the financial projections.

45.     As such, this information must be disclosed in order to cure the materially misleading disclosures regarding both the financial projections developed by the Company as well as the projections relied upon by the Company's financial advisors.

### The Financial Projections Violate Regulation G

46.     The SEC has acknowledged that potential "misleading inferences" are exacerbated

when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[3]

47.    Defendants must comply with Regulation G.  More specifically, the company must disclose the most directly comparable GAAP financial measure <u>and</u> a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.  This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures . . . . [and] more accurately evaluate companies' securities and, in turn, result in a more accurate pricing of securities."[4]

48.    Moreover, the SEC has publicly stated that the use of non-GAAP financial measures can be misleading.[5]   Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Willis Towers included in the Proxy here) implicates the centerpiece of the SEC's

---

[1]    Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure.  17 C.F.R. § 244.101(a)(1).

[2]    Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[3]    SEC, *Final Rule: Conditions for Use of Non-GAAP Financial Measures* (Jan. 22, 2003), *available at* https://www.sec.gov/rules/final/33-8176.htm ("SEC, *Final Rule*").

[4]    SEC, *Final Rule.*

[5]    *See, e.g.*, Nicolas Grabar and Sandra Flow, *Non-GAAP Financial Measures: The SEC's Evolving Views*, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, *available at* http://www.nytimes.com /2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation. Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

49.     The SEC has required compliance with Regulation G, including reconciliation requirements in other merger transactions.  *Compare Youku Tudou Inc., et al.*, Correspondence to SEC 5 (Jan. 11, 2016) (Issuer arguing that Rule 100(d) of Regulation G does not apply to non-GAAP financials relating to a business combination),[7] *with Youku Tudou Inc., et al.*, SEC Staff Comment Letter 1 (Jan. 20, 2016) ("[The SEC] note[s] that your disclosure of projected financial information is not in response to the requirements of, or pursuant to, Item 1015 of Regulation M-A and is thus not excepted from Rule 100 of Regulation G.");[8] *see Harbin Electric, Inc.*, Correspondence to SEC 29 (Aug. 12, 2011) ("Pursuant to the requirements of Regulation G, we

---

[6]     Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), *available at* https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted).

[7]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000110465916089133/filename1.htm.

[8]     *Available at* https://www.sec.gov/Archives/edgar/data/1442596/000000000016062042/filename1.pdf.

have added a reconciliation of actual and projected EBIT to GAAP net income . . . .").[9]

50.     Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).  Thus, in order to bring the Proxy into compliance with Regulation G, Defendants must provide a reconciliation of the non-GAAP financial measures to their respective most comparable GAAP financial measures.

### *The Financial Projections are Materially Misleading and Violate SEC Rule 14a-9*

51.     In addition to the Proxy's violation of Regulation G, the lack of reconciliation or, at the very least, the line items utilized in calculating the non-GAAP measures render the financial forecasts disclosed materially misleading as shareholders are unable to understand the differences between the non-GAAP financial measures and their respective most comparable GAAP financial measures.  Nor can shareholders compare the Company's financial prospects with similarly situated companies.

52.     Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading for the reasons discussed above.

---

[9]     *Available at* https://www.sec.gov/Archives/edgar/data/1266719/000114420411046281/ filename1.htm.  *See also Actel Corporation*, SEC Staff Comment Letter 2 (Oct. 13, 2010) ("Opinion of Actel's Financial Advisor, page 24 . . . This section includes non-GAAP financial measures.  Please revise to provide the disclosure required by Rule 100 of Regulation G."), *available at* https://www.sec.gov/Archives/edgar/data/907687/000000000010060087/filename 1.pdf.  *See also The Spectranetics Corp.*, SEC Staff Comment Letter 1 (July 18, 2017) ("Item 4. The Solicitation or Recommendation Certain Spectranetics Forecasts, page 39 . . . [P]rovide the reconciliation required under Rule 100(a) of Regulation G"), *available at* https://www.sec.gov/Archives/edgar/data/789132/000000000017025180/filename1.pdf.  The SEC Office of Mergers and Acquisitions applied Regulation G in these transactions, which reflect the SEC's official position.  Any claim that the SEC has officially sanctioned the use of non-GAAP financial forecasts for business combinations when the Board itself created and relied on such non-GAAP forecasts to recommend a transaction such as the Proposed Transaction is incorrect.  The SEC's website provides certain unofficial guidance for certain matters, called Compliance and Disclosure Interpretations ("C&DI's") which through the use of Q&As reflect the views of particular SEC staff and on which certain issuers have in the past claimed an exemption from Regulation G.  The SEC itself expressly disclaims C&DI's as they are not regulations that have been reviewed by the SEC, and the SEC expressly states that they are not binding and should not be relied on.  *See* www.sec.gov/divisions/corpfin/cfguidance.shtml (last visited May 18, 2020).

53.     As such, financial projections are plainly material, and shareholders would clearly want a complete and non-misleading understanding of those projections.

54.     In order to cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information on pages 108-09 of the Proxy, Defendants must provide a reconciliation table of the non-GAAP financial measures to the most comparable GAAP measures and the calculated values for the combined company's pro forma Adjusted EBITDA and Unlevered Free Cash Flow.

### The Materially Misleading Financial Analyses

55.     The summary of the valuation methodologies utilized by Goldman Sachs, including the utilization of certain of the non-GAAP financial projections described above by Goldman Sachs, in connection with its valuation analyses (*id.* at 97) is misleading in violation of Regulation 14a-9.  The opacity concerning the Company's internal projections renders the valuation analyses described below materially incomplete and misleading, particularly as companies formulate non-GAAP metrics differently.  Once a Proxy discloses internal projections relied upon by the Board, those projections must be complete and accurate.

56.     With respect to Goldman Sachs' *Illustrative Value of Future Share Price Analysis* for Willis Towers, the Proxy discloses that Goldman Sachs performed an analysis on the implied present value of the future share price of Willis Towers on a standalone basis. *Id.* at 99. Goldman Sachs first calculated the implied standalone values per Willis Towers share for each fiscal year 2020 to 2022, by applying price to next twelve month estimated cash earnings per share multiples of 15.5x to 17.5x to the estimates of the next twelve months earnings per ordinary share for the years 2020 to 2022. *Id.* at 99. Goldman Sachs discounted these values to March 6, 2020, using a discount rate of 5.7%, which reflected Willis Towers' cost of equity. Goldman Sachs then added

the cumulative present value of future dividends per Willis Towers share projected to be paid using a discount rate of 5.7%, reflecting Willis Tower's cost of equity.

57.     The Proxy fails to disclose whether the earnings per share estimates used by Goldman Sachs in this analysis are the same as the Adjusted Earnings Per Share estimates disclosed by Willis Tower management, the value of the projected future dividends and the inputs and assumptions that went into the selection of the Company's cost of equity.

58.     With respect to Goldman Sachs' *Illustrative Value of Future Share Price Analysis* of the combined company, Goldman Sachs Goldman Sachs performed an analysis of the implied present value of the Merger Consideration per Willis Tower share based on the combined company. *Id.*  Goldman Sachs first calculated the implied per share values of the combined company for each fiscal year 2020 to 2022, by applying price to next twelve months estimated cash earnings per share multiples of 16.4x to 20.3x to estimates of earnings per ordinary share of the combined company and estimates of dividends per Aon share, reflecting the dividends per share of the combined company for the next twelve months for each fiscal year 2020 to 2022. *Id.* Goldman Sachs discounted these values to March 6, 2020, using a discount rate of 5.75%, which reflected the cost of equity of the combined company. *Id.* Goldman Sachs then added the cumulative present value of the future dividends per Aon share projected to be paid using a discount rate of 5.7%, reflecting the combined company's cost of equity. *Id.* at 100.

59.     The Proxy fails to disclose the estimated earnings per share of the combined company for fiscal years 2020 to 2022, the value of the future dividends estimated to be paid, the value of the synergies and the inputs and assumptions that went into the selection of the combined company's cost of equity.

60.    The Proxy discloses that Goldman Sachs performed a discounted cash flow analysis on Willis Towers, Aon and the combined company. *Id.* at 100. With respect to Goldman Sachs's *Illustrative Discounted Cash Flow Analysis* of Willis Towers, the Proxy discloses that Goldman Sachs discounted to present value, as of December 31, 2019 Willis Towers' estimated unlevered free cash flow for each fiscal years 2020 through 2024 and a range of terminal values for the Company, using a discount rate range of 5.5% to 6.5%, reflecting estimates of the Company's weighted average cost of capital. *Id.* Goldman Sachs calculated the terminal values by applying an enterprise value to Adjusted EBITDA multiple range of 11.0x to 13.0x to the Company's fiscal year 2025 Adjusted EBITDA. *Id.* Goldman Sachs then subtracted the Company's net debt, representing the balances of financial debt, less cash and cash equivalents and after-tax balances of unfunded pension plan and other post-employment benefit plan liabilities and non-controlling interest value, and divided by the number of fully diluted Willis Towers shares outstanding. *Id.*

61.    With respect to Goldman Sachs's *Illustrative Discounted Cash Flow Analysis* of Aon, the Proxy discloses that Goldman Sachs discounted to present value, as of December 31, 2019 Aon's estimated unlevered free cash flow for each fiscal years 2020 through 2024 and a range of terminal values for Aon, using a discount rate range of 5.5% to 6.5%, reflecting estimates of the Aon's weighted average cost of capital. *Id.* Goldman Sachs calculated the terminal values by applying an enterprise value to Adjusted EBITDA multiple range of 15.5x to 17.0x to Aon's fiscal year 2025 Adjusted EBITDA. *Id.* Goldman Sachs then subtracted Aon's net debt and non-controlling interest value and divided by the number of fully diluted Aon shares outstanding. *Id.*

62.    With respect to Goldman Sachs's *Pro Forma Discounted Cash Flow Analysis and Illustrative Present Value of Aon Shares to be Received by WTW Shareholders in the Business*

*Combination Agreement* analysis, Goldman Sachs discounted to present value, as of December 31, 2019 Aon's pro forma estimated unlevered free cash flow for each fiscal years 2020 through 2024 and a range of terminal values for the pro forma combined company, using a discount rate range of 5.5% to 6.5%, reflecting estimates of Aon's pro forma weighted average cost of capital and taking into account the estimated synergies. *Id.* at 101. Goldman Sachs calculated the terminal values by applying an enterprise value to Adjusted EBITDA multiple range of 13.6x to 15.3x to Aon's pro forma fiscal year 2025 Adjusted EBITDA. *Id.* Goldman Sachs then subtracted the sum of the standalone net debt and non-controlling interest balances for both Willis Towers and Aon and divided by the number of fully diluted shares outstanding for the combined company. *Id.*

63.     With respect to Goldman Sachs's discounted cash flow analysis of Willis Towers, the Proxy fails to disclose the calculated terminal values, the inputs used to calculate the Company's weighted average cost of capital, the value of the Company's net debt or its inputs, the value of the Company's non-controlling interests, how stock based compensation was treated or the number of fully diluted Willis Towers shares outstanding.

64.     With respect to Goldman Sachs's discounted cash flow analysis of Aon, the Proxy fails to disclose the calculated terminal values, the inputs used to calculate Aon's weighted average cost of capital, the value of Aon's net debt and non-controlling interests, how stock based compensation was treated or the number of fully diluted Aon shares outstanding.

65.     With respect to Goldman Sachs's *Pro Forma Discounted Cash Flow Analysis and Illustrative Present Value of Aon Shares to be Received by WTW Shareholders in the Business Combination Agreement* analysis, the Proxy fails to disclose Aon's pro forma unlevered free cash flow for fiscal years 2020 through 2024, the estimated synergies, the calculated terminal values, the inputs used to calculate Aon's pro forma weighted average cost of capital, the combined value

of the Company's and Aon's net debt and non-controlling interests, how stock based compensation was treated or the number of fully diluted shares outstanding of the combined company.

66.     Since information was omitted, shareholders are unable to discern the veracity of Goldman Sachs' discounted cash flow analyses. Without further disclosure, shareholders are unable to compare Goldman Sachs's calculations with the Company's financial projections. The absence of any single piece of the above information renders Goldman Sachs's discounted cash flow analyses incomplete and misleading. Thus, the Company's shareholders are being materially misled regarding the value of the Company.

67.     As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value . . . ." *Id.* (footnote omitted). As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . . The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

68.     Therefore, in order for Willis Towers shareholders to become fully informed regarding the fairness of the Merger Consideration, the material omitted information must be disclosed to shareholders.

69.     In sum, the Proxy independently violates both: (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to its most directly comparable GAAP

equivalent; and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the Proxy independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the Proxy to garner votes in support of the Proposed Transaction from Willis Towers shareholders.

70.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

71.     Further, failure to remedy the deficient Proxy and consummate the Proposed Transaction will directly and proximately cause damages and actual economic loss to shareholders (i.e. the difference between the value to be received as a result of the Proposed Transaction and the true value of their shares prior to the merger), in an amount to be determined at trial, to Plaintiff and the Class.

### COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)**

72.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

73.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection

of investors, to solicit or to permit the use of his name to solicit any [Proxy] or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

74.     As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a).  SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most comparable" GAAP measure.  17 C.F.R. § 244.100(a).

75.     The failure to reconcile the non-GAAP financial measures included in the Proxy violates Regulation G and constitutes a violation of Section 14(a).

76.     As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief as the Court deems appropriate, including rescissory damages.

## COUNT II

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

77.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

78.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in registration statements that contain "any statement which, at the time and in the light of the circumstances

under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9(a).

79.     Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).

80.     Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

81.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors and/or officers, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

82.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information

identified above in connection with their decision to approve and recommend the Proposed Transaction.

83.    The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

84.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

85.    Willis Towers is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

86.    The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

87.    As a direct and proximate result of the dissemination of the false and/or misleading Proxy Defendants used to recommend that shareholders approve the Proposed Transaction, Plaintiff and the Class will suffer damages and actual economic losses (i.e. the difference between the value they will receive as a result of the Proposed Transaction and the true value of their shares prior to the merger) in an amount to be determined at trial and are entitled to such equitable relief

as the Court deems appropriate, including rescissory damages.

## COUNT III

**(Against the Individual Defendants for Violations
of Section 20(a) of the Exchange Act)**

88.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

89.     The Individual Defendants acted as controlling persons of Willis Towers within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as directors and/or officers of Willis Towers, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

90.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

91.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing the Proxy.

92.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

93.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

94.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.     Directing Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing and to award damages arising from proceeding with the Proposed Transaction;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable

attorneys' and expert fees and expenses; and

E.      Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 19, 2020

Respectfully submitted,

By: _James M. Wilson, Jr._
Nadeem Faruqi
James M. Wilson, Jr.
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Tel.: (212) 983-9330
Fax: (212) 983-9331
Email: nfaruqi@faruqilaw.com
          jwilson@faruqilaw.com

_Counsel for Plaintiff_

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, Richard Carter ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed a draft complaint against Willis Towers Watson PLC ("Willis Towers") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2.    Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.    Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.    Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.    Plaintiff's transactions in Willis Towers securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.    In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7.    Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 17th day of May, 2020.

Richard Carter

| Transaction (Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| Purchase | 06/21/19 | 100 |
|  |  |  |
|  |  |  |